JUSTICE RICE,
concurring in part and dissenting in part.
¶163 I concur with this Court’s decision on Issue 1, that Article II, Sections 10 and 11 of the Montana Constitution are self-executing, and provide the basis for a right of action for damages for violation thereof. *47 Regarding the Article II, Section 17 claim, I join Chief Justice Gray’s dissent. I respectfully dissent from this Court’s determination on Issue 2 that the Defendants are not entitled to statutory immunity pursuant to § 2-9-103(1), MCA. Based on the plain language and plain meaning of the statute, I would affirm the District Court’s conclusion that the Defendants are entitled to immunity thereunder and, therefore, would not address Issue 3 or Issue 4.
¶164 Section 2-9-103(1), MCA, declares:
If an officer, agent, or employee of a governmental entity acts in good faith, without malice or corruption, and under the authority of law and that law is subsequently declared invalid as in conflict with the constitution of Montana or the constitution of the United States, neither he nor any other officer or employee of the governmental entity he represents nor the governmental entity he represents is civilly liable in any action in which he, such other officer, or such governmental entity would not have been liable had the law been valid.
¶165 First, to be entitled to immunity, the officers must act in good faith and without malice or corruption. In considering the statute, the Court does not address the officers’ intent or motivation. The record reveals that Officers Ames and Caraway, upon receiving the writs of execution, and prior to serving them, conferred with Judge Kober in order to clarify their duties, and received instructions from her. Thereafter, they also spoke with Dorwart himself, and received instructions from him regarding entry into his home. The District Court found, as we did in Dorwart I, that the officers “were acting on a reasonable, good faith understanding of the law,” and, applying the statutory definitions of “corruptly” and “malice,” found that neither officer “had a ‘wrongful design to acquire or cause some pecuniary or other advantage’ to themselves by their actions, nor did they ‘wish to vex, annoy, or injure’ Dorwart by their actions.” I conclude the District Court’s findings are correct, and that the statute’s requirement that the officers act in good faith, without malice or corruption, was satisfied.
¶166 Second, the statute requires that the officers must act “under authority of law.” Dorwart and amicus Montana Trial Lawyers Association argue that there was no statute, court order or court decision which granted Defendants authority to enter Dorwart’s home, and therefore, Defendants were not acting under authority of law. Dorwart challenges the District Court’s reliance on Ramsey v. Burns (1902), 27 Mont. 154, 69 P. 711, in concluding that then-existing law supported the actions of Ames and Caraway.
*48 ¶167 At the times in question here, Ramsey was the only Montana case interpreting the scope and authority derived from a writ directing a levy on property. In executing a writ of attachment in Ramsey, the officer entered Ramsey’s business and levied upon her personal property, remaining in possession of the business for five days. Ramsey subsequently sued the officer and, after a jury verdict against him, the officer appealed a jury instruction which stated that an officer with a writ of attachment “has not any right or authority to take and hold possession of any building in which the personal property to be seized is, and that he and his bondsmen are liable in damages ‘if he takes possession of such room or premises.’ ” Ramsey, 27 Mont. at 156, 69 P. at 712.
¶168 This Court determined the instruction to be error, stating:
An officer has the right to enter a business place against the will of the occupant, permission having been asked and refused, and to seize the property therein belonging to the occupant and subject to levy .... The officer has a right to enter and have possession of the place ... for a reasonable time, and he may have there the goods in storage for such reasonable time as he may require to pack them and to procure the necessary transportation for their removal.
Ramsey, 27 Mont. at 156-57, 69 P. at 712. Ramsey had never been overruled and was the state of the law at the time deputies Ames and Caraway entered Dorwart’s residence in 1991 to execute on the writs of execution.
¶169 Although Ramsey did not squarely address the constitutional search and seizure issue relating to a writ of execution or the scope and authority of a writ in the context of levying personal property at a person’s residence, this Court stated in Dorwart I, that “[wjhile Ramsey did not address or resolve whether such an entry would survive constitutional scrutiny, it certainly appeared to authorize an official acting pursuant to a writ directing the levy on a person’s property to enter and take possession of the premises in which property subject to execution was located in order to effectuate the execution without the necessity of a warrant.” Dorwart I, ¶ 109. We further concluded that “the deputies entered Dorwart’s home .to execute the writs of execution according to procedures which appeared to be appropriate under then-existing Montana law ....” Dorwart I, ¶ 126.
¶170 Followingthis Court’s lead, the District Court determined that Ramsey remained a potential source “of authority on which to base a conclusion that Ames and Caraway did not violate Dorwart’s rights *49 when they entered his home.” The District Court determined that the “then-existing law supported the actions of Ames and Caraway in the manner that they executed the writs of execution.... As required by § 2-9-103(1), MCA, the deputies were acting under authority of law.”
¶171 The majority faults the District Court’s determination that Ames and Caraway acted upon lawful authority because the testimony of Ames and Caraway does not demonstrate that either specifically knew of Ramsey, but that the officers merely “relied upon the writ of execution and Dorwart’s admonishment to use the back door and not let the cat out.”
¶172 It must first be noted that, in addition to the writs and the conversation with Dorwart, the deputies also relied upon an order from Judge Kober to seize the property to satisfy the writs:
Q: [by Mr. Thomas]: [W]hat, in your mind at the time, was your authority for entering the home and searching it?
A: [by Mr. Caraway]: I guess it would be two answers to that. The first would be an order from Judge Kober, and the second would be Mr. Dorwart’s, the conversation with him that we had while downstairs in the Sheriffs Office to enter through the back door due to the fact that it wasn’t locked ....
Q: Any other basis besides those two?
A: Just my obligation as a deputy to follow the orders of the judge and of my department.
Q: Were there any conversations between you or Danny Ames or Sheriff Brophy, for that matter, with Marilyn Kober before going out to Russ Dorwart’s home to serve the writs?
A: Yes, there was.
Q: Can you remember how long before actually going out to his house that conversation was?
A: No, I don’t. I know that we did have the papers to serve, and there was a question about what were we supposed to do. The papers were - they were unique to me .... And it appeared to me that Dan had some questions about it too. We came up, and we spoke to Marilyn [Kober] here in her office. And the papers stated to seize property .... I know I asked her, you know, what does this mean, what does this go and seize property to satisfy this monetary amount, what does this mean. She said to me, you go to his house; you take guns, stereos, whatever is there you think will satisfy this monetary amount.
Q: Would it be correct to say that at least at the time these writs were served, and the entry and search was made of Russ Dorwart’s home, the primary concern of the Sheriffs Department *50 was to try to seize enough property to satisfy the writs, and not whether Russ Dorwart had any rights that might be violated by doing this?
A: I would think that you would be incorrect in that assumption. I think that’s why we had the conversation with the judge, was to make sure that we were doing things as the law allowed us to do .... I think otherwise, we would have went up and served the papers without any question or any conversation. I think we were concerned that we were legally doing things.
Q: I gathered from this case that you believed that the Writs of Execution authorized you to enter into Dorwart’s residence and search for property and seize property to satisfy the writs; is that correct?
A: [by Mr. Ames]: Right.
¶173 The deputies, wanting to be certain that the writs themselves granted authority for them to enter Dorwart’s premises and seize his property, personally requested verification from Judge Kober and were commanded by Judge Kober (“you go to his house; you take [his property]”) to enter the residence and seize Dorwart’s property on the basis of the writ’s authority.
¶174 But more significantly, the Court improperly faults the deputies’ inability to cite to Montana case law. The immunity statute does not require that Ames or Caraway be able to cite to a 1902 Montana case that gave them authority to enter the premises in order to obtain immunity. The statute requires only that the officers “act... under the authority of law.” Thus, if they acted under the authority of law, that portion of the immunity statute, by its plain meaning, is satisfied. The District Court was correct when it agreed with this Court’s conclusions in Dorwart I that Ramsey appeared to authorize the deputies’ actions at a time when “it certainly was not clear ... that their actions violated Dorwart’s search and seizure rights and right to privacy” and that the officers’ actions “appeared to be appropriate under then-existing Montana law.” Because Ramsey was the current state of the law in 1991 when the deputies executed the writ of execution, the deputies acted “under authority of law,” thus satisfying the second element under § 2-9-103(1), MCA.
¶175 The third requirement for immunity under § 2-9-103(1), MCA, is that the law must subsequently be declared invalid as in conflict with the Constitution of Montana or the Constitution of the United States. The majority again faults the District Court because this Court in Dorwart I did not declare that the postjudgment execution statutes were unconstitutional for authorizing entry into Dorwart’s home. *51 However, such a finding is not necessary in order to conclude that the deputies are entitled to immunity under § 2-9-103(1), MCA. The statute merely requires that the law that had provided authority for the deputies’ actions be subsequently declared invalid as in conflict with either the Montana Constitution or the United States Constitution.
¶176 While the Court in Dorwart I did not declare either Ramsey or the postjudgment execution statutes unconstitutional, the unmistakable result of the adoption of the procedural requirement of an execution warrant in Dorwart I is that Ramsey can no longer be a valid, potential source of authority for an official acting pursuant to a writ of execution to enter a person’s property or take possession of the premises in which property subject to execution is located, and to effectuate the execution without the necessity of a warrant. Thus, although this Court did not explicitly declare Ramsey invalid or unconstitutional, Ramsey is no longer valid, as it was in 1991, when it provided authority for officers to enter and levy upon a judgment debtor’s personal property.
¶177 Under the plain language of § 2-9-103(1), MCA, the deputies must act under authority of law which subsequently must be “declared invalid as in conflict with the constitution of Montana or the constitution of the United States.” In adopting the execution warrant requirement as a procedural safeguard, this Court in Dorwart I implicitly declared that Ramsey was no longer a valid source of authority for Ames’ and Caraway’s actions.
¶178 Based on the foregoing, I would conclude that the statutory requirements have been clearly met and that Ames and Caraway are entitled to statutory immunity pursuant to § 2-9-103(1), MCA, and would affirm the District Court’s holding.
¶179 In sum, I conclude that, after its substantial and able review of the issues raised herein, the District Court correctly ruled that a right of action exists for the constitutional violations at issue here, but that the officers under these circumstances were shielded from the claim by statutory immunity.